**NOT RECOMMENDED FOR PUBLICATION**
File Name: 20a0266n.06

No. 19-3326

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
May 12, 2020
DEBORAH S. HUNT, Clerk

| | |
|---|---|
| ALLIED ERECTING AND DISMANTLING CO., INC., | ) |
| | ) |
| **Plaintiff–Appellant,** | ) |
| | ) |
| v. | ) |
| | ) |
| UNITED STATES STEEL CORPORATION, | ) |
| | ) |
| **Defendant–Appellee.** | ) |
| | ) |

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE NORTHERN
DISTRICT OF OHIO

**OPINION**

**BEFORE:  MERRITT, MOORE, and BUSH, Circuit Judges.**

**KAREN NELSON MOORE, Circuit Judge.**  This complex contractual dispute is rooted in a decades-long fight between Allied Erecting and Dismantling Company, Inc. ("Allied") and United States Steel Corporation ("U.S. Steel") over dismantling work Allied performed (or, in some cases, did not perform) at a defunct U.S. Steel steelmaking plant in eastern Pennsylvania ("Fairless").  The dispute culminated in a three-week jury trial in 2015, which in turn resulted in a $10.7 million judgment in U.S. Steel's favor.

Two years ago, we issued an opinion affirming that judgment in substantial part.  *See Allied Erecting & Dismantling Co. v. U.S. Steel Corp.*, 726 F. App'x 279 (6th Cir. 2018) ("*Allied I*").  In that decision, however, we left open one question for the district court to resolve on remand: whether two of Allied's breach of contract claims—"count IV" and "count V" of Allied's complaint, which, we concluded, the district court had erroneously dismissed on statute of limitations grounds—could be resolved by the court as a matter of law, or whether the underlying

factual disputes were sufficiently material such that another jury trial would be needed to address them. The district court thought no genuine disputes of material fact existed and so it granted U.S. Steel judgment as a matter of law ("JMOL") on both counts. Allied again appealed.

We are sympathetic to the district court's desire to bring this case to an end. As noted above, this complex commercial litigation has lasted literally decades, and has already resulted in one time-consuming jury trial (and one remand after appeal). But sometimes the law and efficiency are not on the same team. And, in our view, the law in this case requires that we do the inefficient thing. That is, that we **REVERSE** the district court's grant of JMOL and **REMAND**—again—so that the court can conduct a new trial on Allied's two remaining claims.

## I. BACKGROUND

Because we have reviewed this case's background once before, in this decision we focus on only those facts relevant to the parties' present dispute.

### A.

There are two contracts at issue. They are long and complicated in the abstract. But when one focuses on just the provisions pertinent to this appeal, it quickly becomes apparent that the material exchange is a simple one: Allied dismantles U.S. Steel's Fairless plant at essentially no cost, and, in return, U.S. Steel lets Allied keep and sell the scrap metal generated by that dismantling work.

First, there is the parties' 1992 construction contract (which concerned dismantling work to be performed at the "hot end" of the Fairless plant[1] and which the parties refer to as the

---

[1]This litigation concerns dismantling work to be performed at the "cold end" of the plant, by contrast. But the distinction is immaterial for present purposes.

"1992 Specification"). In this contract, U.S. Steel promised Allied that, after it (U.S. Steel) completed asbestos removal at any Fairless facility it intended to dismantle, it would "assign to [Allied] ownership of [that] facility," R.269-2 (1992 Specification § 5.2) (Page ID #18069), in exchange for just one dollar, *id*. § 8.1 (Page ID #18084). And, the contract continued, this assignment of ownership would include, among other materials, (a) "[a]ll ferrous and non-ferrous scrap resulting from the dismantling work," (b) "[a]ll ferrous and non-ferrous scrap located within each dismantling area," and (c) "[r]ailroad track located within a specific dismantling area which exclusively serves that dismantling area." *Id*. §§ 5.2.1, 5.2.2, 5.2.5 (Page ID #18069–70). Moreover, the contract noted near its conclusion, although U.S. Steel could *not* "remove any complete facility from the scope of this Specification" after Allied commenced work at that facility, U.S. Steel *could* remove "a building" from Allied's scope of work, *so long as* U.S. Steel paid Allied "50% of the 'Scrap Value.'" *Id*. §§ 10.2, 10.3 (Page ID #18084).

Second, there is the 2003 settlement agreement between the parties (the "2003 AIP"), which built upon the 1992 Specification. In this contract, U.S. Steel promised Allied that "[a]ny further dismantling work" that needed to be done at the Fairless plant (and that U.S. Steel had "released and authorized in writing for dismantling") would "be awarded to and performed by [Allied]" pursuant to "the same relevant terms and conditions contained in" the 1992 Specification. R.269-4 (2003 AIP § III) (Page ID #18108). Indeed, just like in the 1992 Specification, this agreement stated explicitly, "[Allied] will own all ferrous and non-ferrous scrap generated on any projects awarded to [it]." *Id*. § II(B)(7) (Page ID #18107). And in exchange for all this, the agreement concluded, Allied would conduct its dismantling free of charge. *See id*. § III (Page ID #18108) ("[S]uch dismantling shall be at no cost to U.S. Steel. . . .").

3

**B.**

We now turn to Allied's two breach of contract claims, and the evidence it adduced at trial in support of those claims.

First, there is Allied's breach of contract count IV. Here, Allied alleges that U.S. Steel removed certain buildings from the scope of Allied's dismantling work without compensating Allied for the buildings' scrap value, thus violating the 1992 Specification's *removal compensation* provision. *See* R.43 (2d Am. Compl.) (Page ID #549–51). And, as evidence of this breach, Allied points to the following trial testimony and documentation:

(1) In 2004, U.S. Steel "released and authorized" the Fairless plant's "Tin and Sheet" facility for dismantling (thus awarding that facility to Allied under the 2003 AIP), *see*, *e.g.*, R.274 (Trial Tr.) (Page ID #18768–77);

(2) Shortly thereafter, Allied commenced work at the Tin and Sheet facility (thus satisfying the removal compensation provision's precondition for compensation), *see, e.g.*, *id.* at Page ID #18857, 18868;

(3) during or after June 2008,[2] U.S. Steel removed from Allied's scope of dismantling work certain buildings within the Tin and Sheet facility, *see, e.g.*, *Allied I*, 726 F. App'x at 285 (collecting record citations);

(4) U.S. Steel failed to pay Allied 50% of the removed buildings' "Scrap Value," in violation of the 1992 Specification's removal compensation provision, *see, e.g.*, R.274 (Trial Tr.) (Page ID #18868–69); and

(5) this breach caused Allied to suffer damages, *see, e.g.*, R.280 (Trial Tr.) (Page ID #20558–61).

---

[2]Why "June 2008"? Because, in our prior decision, we emphasized that the only reason U.S. Steel was *not* entitled to JMOL on Allied's breach of contract counts IV and V (whereas U.S. Steel *was* so entitled on Allied's other contract claim) was that "Allied introduced evidence that could lead a reasonable factfinder to conclude that U.S. Steel" breached the contractual provisions at issue in counts IV and V "within the four-year period preceding Allied's filing of its June 2012 complaint," *i.e.*, within the relevant Pennsylvania statute of limitations. *Allied I*, 726 F. App'x at 285. Thus, if Allied rested its contract claims on breaches that occurred *before* June 2008, that would contradict our prior ruling.

Second, there is Allied's (distinct but similar) breach of contract count V. Here, Allied more broadly alleges that U.S. Steel refused to let Allied remove *any* scrap or railroad track from the Tin and Sheet facility—all of which Allied supposedly owned—thus violating the 1992 Specification's *assignment of ownership* provision. *See* R.43 (2d Am. Compl.) (Page ID #551–53). And, as evidence of this breach, Allied points to the following trial testimony and documentation:

(1) In 2004, U.S. Steel "released and authorized" the Tin and Sheet facility for dismantling (thus awarding that facility to Allied under the 2003 AIP), *see, e.g.*, R.274 (Trial Tr.) (Page ID #18768–77);

(2) Shortly thereafter, U.S. Steel conducted asbestos removal at the Tin and Sheet facility and Allied paid it $1 consideration (thus satisfying the 1992 Specification's preconditions for assignment of ownership), *see, e.g.*, *id.* at Page ID #18805–10; R.43-1 (Property Transfer Order) (Page ID #561–62);

(3) during or after June 2008, U.S. Steel refused to let Allied remove scrap and railroad track from the Tin and Sheet facility, in violation of the 1992 Specification's assignment of ownership provision, *see, e.g.*, R.274 (Trial Tr.) (Page ID #18870–74); Tr. Ex. P-350 (June 22, 2012 Ranum Letter); and

(4) this breach caused Allied to suffer damages, *see, e.g.*, R.281 (Trial Tr.) (Page ID #20625–26).

## C.

On remand from *Allied I*, however, the district court concluded that U.S. Steel was entitled to JMOL on both count IV and count V, and that, consequently, a new trial as to just those two claims was unwarranted. *See Allied Erecting & Dismantling Co. v. U.S. Steel Corp.*, No. 4:12-cv-1390, 2019 WL 1227191 (N.D. Ohio Mar. 15, 2019). The district court's reasoning was twofold.

First, the district court reasoned, because the 1992 Specification stated that Allied would own "[a]ll ferrous and non-ferrous scrap *resulting from* [its] dismantling work," and because the 2003 AIP similarly stated that Allied would own the scrap "*generated* on any projects awarded to

5

it," the contracts contained a clear and unambiguous "generation requirement," under which "Allied had to generate the scrap (*i.e.*, actually perform the dismantling) in order to have the ability to use the scrap or sell it for revenue." *Id.* at *4–5. And, the district court continued, because "[t]he trial record [was] devoid of any evidence that Allied generated scrap" at the Tin and Sheet facility, Allied was not contractually entitled to *any* of the facility's scrap value, thus defeating counts IV and V as a matter of law. *Id.* at *5.

Second, the district court reasoned, even if its contractual holding lacked merit, U.S. Steel was nonetheless entitled to JMOL on both of Allied's claims for evidentiary reasons. More specifically, the district court held, because Allied's evidentiary showings as to "when" U.S. Steel removed buildings from Allied's scope of work (count IV), and/or denied Allied's requests to collect scrap and railroad track (count V), were "unspecific, vague, and conclusory," Allied's claims failed as a matter of law, the "generation requirement" notwithstanding. *Id.* at *6.

Allied timely appealed, challenging both conclusions.

## II. DISCUSSION

We start with the standard of review, and then turn to an analysis of the district court's decision.

### A.

"If a party has been fully heard on an issue during a jury trial," and, after that showing, the district court "finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue," the court may grant the opposing party JMOL and thereby remove that issue from the jury's province. Fed. R. Civ. P. 50(a). Just as in the summary judgment context, however, the district court may grant such a motion only if, "when viewing the evidence in a light

most favorable to the non-moving party, giving that party the benefit of all reasonable inferences, there is *no* genuine issue of material fact for the jury, and reasonable minds could come to *but one* conclusion in favor of the moving party." *Barnes v. City of Cincinnati*, 401 F.3d 729, 736 (6th Cir. 2005) (emphasis added). Likewise, we review that grant of JMOL de novo on appeal, reversing and remanding for retrial if we find error. *Cf. Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 324 (6th Cir. 2007) (reversing post-trial grant of JMOL to defendant and reinstating jury's verdict in favor of plaintiff).

When considering the sufficiency of a party's evidentiary showing in a Pennsylvania-based contract dispute like this one, moreover, we must remember that a court can interpret a contract as a matter of law only "[w]hen the terms of [the] contract are clear and unambiguous." *Ins. Adjustment Bureau, Inc. v. Allstate Ins. Co.*, 905 A.2d 462, 468 (Pa. 2006). If a contract's terms are "ambiguous," by contrast—meaning they are "reasonably susceptible of different constructions"—then the interpretive task must be conducted by "the finder of fact," here, the jury. *Id*. at 468–69.

**B.**

Applying these principles, we find that neither conclusion offered by the district court in support of JMOL holds water.

**1.**

First, the district court's conclusion that the contracts contain a clear and unambiguous "generation requirement" both misreads the contracts and misunderstands the nature of Allied's claims.

7

We start with the contracts. There is nothing in the 1992 Specification unambiguously stating that Allied had to tear a building down in order to have *any* claim to the scrap contained therein. Rather, the contract appears to say that U.S. Steel would assign ownership of a facility's scrap to Allied *before* dismantling commenced, as evidenced by the contract's statement that U.S. Steel's assignment of ownership would include "[a]ll ferrous and non-ferrous scrap *located within* each dismantling area," and "[r]ailroad track *located within* a specific dismantling area which exclusively serves that dismantling area," *in addition to* "[a]ll ferrous and non-ferrous scrap *resulting from* [Allied's] dismantling work." And although the 2003 AIP contemplates Allied owning only scrap "generated on any projects awarded to it"—not scrap already "located within" said project—that later contract also states explicitly that Allied would perform any post-2003 work awarded to it pursuant to "the same relevant terms and conditions contained in" the 1992 Specification, which arguably includes the 1992 Specification's assignment of ownership provision. Moreover, as Allied points out in its brief, the parties' pre-litigation course of conduct strongly suggests that U.S. Steel thought Allied's ownership rights vested before dismantling commenced. *See* Appellant Br. at 31. Indeed, Allied emphasizes, on August 7, 2004 U.S. Steel *actually assigned* to Allied U.S. Steel's ownership right in the scrap "associated with" the Tin and Sheet facility, just as the 1992 Specification contemplated, and despite the fact that Allied had not yet begun tearing those buildings down. R.43-1 (Property Transfer Order) (Page ID #561–62). In light of these facts, then, it is at least ambiguous whether the contracts contained a "generation requirement," thus rendering JMOL on that basis inappropriate. *See Ins. Adjustment Bureau, Inc.*,

905 A.2d at 469 (holding that if a contract's terms are "ambiguous" then the interpretive task must be conducted by "the finder of fact").[3]

More still, even if the contracts did contain a clear and unambiguous generation requirement, that would still not entitle U.S. Steel to JMOL on *both* of Allied's claims. That is because count IV of Allied's complaint has nothing to do with the 1992 Specification's assignment of ownership provision, but instead centers around that contract's removal compensation provision. The district court simply overlooked this point.[4]

## 2.

The district court's alternative, evidentiary-based holding fares no better. With respect to count IV, the district court appeared to miss (inadvertently) that, in *Allied I*, we effectively resolved this exact point in Allied's favor. *See Allied I*, 726 F. App'x at 285 (citing multiple trial records from which a reasonable juror could have concluded that U.S. Steel removed "specific buildings" from Allied's scope of work, after June 2008). And as for count V, although the district court did

---

[3]The district court's contrary conclusion is puzzling, because, on at least two prior occasions in this litigation, the court recognized this exact ambiguity, and said that it could not be resolved as a matter of law. *See, e.g.*, *Allied Erecting & Dismantling Co. v. U.S. Steel Corp.*, 2013 WL 5442276, at *14 (N.D. Ohio Sept. 27, 2013) (denying U.S. Steel's motion to dismiss); *Allied Erecting & Dismantling Co. v. U.S. Steel Corp.*, 52 F. Supp. 3d 866, 882–85 (N.D. Ohio 2014) (denying U.S. Steel summary judgment on this basis and observing simply, "[t]hese are factual disputes"). And although the district court appeared to change its mind on remand because it (belatedly) realized that it would have "border[ed] on ludicrous" for U.S. Steel to assign Allied rights to scrap that Allied had not yet generated (because U.S. Steel would then have had "no way of forcing Allied to complete the dismantling in a timely fashion"), *Allied Erecting*, 2019 WL 1227191, at *5, that is far from the only reasonable interpretation of the parties' agreements. After all, as Allied notes in response, Allied could only make "money if it [was] taking down buildings and generating scrap." Appellant Br. at 39 n.22. So, in Allied's view, there was "no incentive—assignment of ownership or no assignment of ownership—for [it] to delay in taking down buildings." *Id.*

[4]For what it's worth, the existence of a generation requirement may not doom Allied's *entire* count V as a matter of law either. Even if a "generation requirement" prevented Allied from owning the *potential* scrap contained within the Tin and Sheet facility (because Allied couldn't own that scrap until generating it), Allied may nonetheless have owned any *pre-existing* scrap and railroad track contained therein (assuming of course that such scrap existed), per §§ 5.2.2 and 5.2.5 of the 1992 Specification. But because neither the trial record nor the parties' briefing clarify whether this issue is actually in dispute, we do not address it further.

cite on-point trial testimony that appears vague and conclusory on its face—in the sense that the testifying witness did not say exactly *when* Allied requested that U.S. Steel allow it to remove scrap and railroad track from the dismantling sites, *see Allied Erecting*, 2019 WL 1227191, at *5— the district court overlooked a letter submitted into evidence alongside that testimony showing that Allied made such requests starting in 2010. *See* Appellant Br. at 49–51 (discussing Tr. Ex. P-350). Moreover, as Allied notes in its brief, given the straightforward nature of count V (at least with respect to breach; damages are another question), it is not clear why Allied needed to submit more detailed evidence on this point than it did in order to take its claim to a jury. *See id*. at 49 ("The fact is that there was not much more that Allied could have said to prove a negative (that U.S. Steel did not make these facilities available to Allied), other than the fact that Allied asked U.S. Steel to make the rail and nonferrous [scrap] available and U.S. Steel refused.").

The district court thus erred in granting U.S. Steel JMOL.

## C.

We make two points in conclusion. First, we acknowledge that U.S. Steel raised two alternative grounds for affirmance in its brief. *See* Appellee Br. at 31–47. But because neither ground would permit us to affirm the district court's grant of JMOL in full, as the district court seemed to acknowledge in its remand order, *see Allied Erecting*, 2019 WL 1227191, at *3 n.6, *6 n.12, we leave it to the district court to resolve these issues in the first instance, within the context of a new trial. Second, we acknowledge Allied's request that we re-assign this matter to a different judge on remand. *See* Appellant Br. at 37–38, n.21 (citing *John B. v. Goetz*, 626 F.3d 356 (6th Cir. 2010)). But because we detect no bias in the district court's handling of this case—to the

contrary, we find admirable the district court's patience in this matter—we decline to grant Allied's request for reassignment.

### III.  CONCLUSION

For these reasons, we **REVERSE** the district court's judgment and **REMAND** for a new trial.